UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UMG RECORDINGS, INC.,
A Delaware corporation,
UNIVISION MUSIC LLC, a
Delaware limited liability
company, DISA LLC, a Delaware
limited liability company, and
FONOVISA, INC., a California
corporation,

      NO. CIV. S-04-2611 FCD DAD

      Plaintiffs,

   v.

      MEMORANDUM AND ORDER

DISCO AZTECA DISTRIBUTORS,
INC.,

      Defendant.
_____/

AND RELATED COUNTERCLAIM.

----oo0oo----

    This matter is before the court on plaintiffs UMG

Recordings, Inc. and Fonovisa LLC and plaintiffs and

counterdefendants Univision Music LLC and Disa LLC (collectively

"plaintiffs") motion for summary judgment or, alternatively,

partial summary judgment.[1]  By the motion, plaintiffs seek: (1) a

judgment of liability against defendant Disco Azteca

Distributors, Inc. ("defendant" or "Disco Azteca") for copyright

infringement of 38 of plaintiffs' works ; (2) a determination

that defendant's infringement was "willful" within the meaning of

Section 504 of the Copyright Act, 17 U.S.C. § 504(c)(2); and (3)

a judgment of non-liability in favor of counterdefendants

Univision Music LLC and Disa LLC ("counterdefendants") on

defendant's counterclaim for copyright infringement.

Defendant does not oppose the motion with respect to its

direct liability for copyright infringement,[2] but argues that a

finding of willfulness cannot be made as a matter of law because

triable issues of fact remain regarding its state of mind.

Likewise, defendant argues that judgment of non-liability in

favor of counterdefendants cannot be made as triable issues of

fact exist as to whether counterdefendants infringed defendant's

copyrights in two sound recordings.

For the reasons set forth below, the court GRANTS IN PART

and DENIES IN PART plaintiffs' motion.  Considering plaintiffs'

---

[1]     Because oral argument will not be of material
assistance, the court orders this matter submitted on the briefs.
See E.D. Cal. Local Rule 78-230(h).

[2]     The court acknowledges that defendant did not expressly
state in its opposition that it did not oppose plaintiffs' motion
with respect to a finding of liability of infringement; however,
aside from one bald denial of liability in its Statement of
Disputed Facts (under the heading "Contentions of Law"),
defendant's papers do not address the issue of liability at all,
and at times, make reference to the fact that the court will/may
find liability.  (Opp'n, filed July 21, 2006, at 4, 5.)  Indeed,
the entirety of defendant's opposition focuses on the issue of
"willfulness," and as such, the court finds that defendant
concedes liability for copyright infringement.  The only
contested issue is whether that infringement was "willful."

2

evidence proffered in support of the motion and defendant's non-opposition thereto, the court grants plaintiffs' motion as to liability and finds that defendant directly infringed 38 of plaintiffs' copyrighted works.  However, the court cannot find, as a matter of law, that said infringement was "willful."  On that issue, triable issues of fact remain.  As to defendant's counterclaim for infringement, plaintiffs' motion is also granted as defendant's counterclaim is based on a right to attribution (*i.e.*, the provision of proper credit to Disco Azteca and the writer of the original song on plaintiffs' CDs) which is not a protected right under the Copyright Act.

**BACKGROUND**

**A.   Plaintiffs**

Plaintiffs are record companies engaged in the business of creating, manufacturing, distributing, and selling musical and sound recordings.  (Def.'s Resp. to Pls.' Stmt. of Undisputed Facts ["SUF"], filed July 21, 2006, ¶ 1.)  Plaintiffs are the owners or exclusive United States licensees of 38 musical works, listed on Schedules A and B to the Second Amended Complaint, and have sold and distributed these works throughout the United States.  (SUF ¶ 2.)

**B.   Disco Azteca**

Disco Azteca is in the business of selling and distributing sound recordings both as a wholesaler and in retail outlets that it owns and operates. (SUF ¶ 3.)  Disco Azteca operates warehouses in Stockton, California and Chicago, Illinois and eleven retail stores throughout California and Nevada.  (SUF ¶ 4.)  The owners of Disco Azteca, Arturo, Humberto, Jose and

3

Christiano Sanchez (the "Sanchezes"), have been involved in the music business since 1974. (SUF ¶ 5.)  In addition to Disco Azteca, the Sanchezes also own and/or operate a recording company called Mar International S.A. ("Mar International") and a music publishing company called Jarabe Publishing Company ("Jarabe"), which operate out of the same office as Disco Azteca. (SUF ¶ 6.) Through Mar International, the Sanchezes have created 300 CDs that have collectively sold hundreds of thousands of copies, and Jarabe controls and/or owns thousands of copyrights in musical works which have been distributed in the United States and abroad. (SUF ¶ 7.)  The Sanchezes arrange for the copyrights in these works to be registered with the United States Copyright Office. (Id.)

From 1985 until about three years ago, Mar International was a member of an anti-piracy organization called ALARM, which conducted raids for the purpose of confiscating counterfeit products, and created educational materials about piracy and copyright law. (SUF ¶ 8.)  For over 20 years, when legal issues arise, Disco Azteca employs outside counsel (David White, defendant's counsel in this case). (SUF ¶ 9; Def.'s Stmt. of Disputed Facts ["DDF"], filed July 21, 2006, ¶ 1.)  Jose Sanchez ("Sanchez") testified that he is familiar generally with the copyright laws and the protections they afford to copyrighted musical work, and he has, over the years, come to understand the Copyright Act's prohibition on "parallel imports."[3]  (SUF ¶ 10.)

---

[3]     The term "parallel imports" refers to "[r]ecords of foreign manufacture that are imported to and sold in the United States in violation of exclusive distribution rights." CBS, Inc. v. Casino Record Distributors of Florida, Inc., 654 F. Supp. 677,

Although, Disco Azteca has not been involved previously in a copyright lawsuit, and has not had prior experience dealing with the issue of parallel imports.  (DDF ¶ 2.)

### C.   Plaintiff's Cease & Desist Letter to Disco Azteca

On March 5, 2003, after receiving information that Disco Azteca may have purchased or imported parallel imports of plaintiffs' work, plaintiff UMG Recordings, Inc. ("UMG") sent a letter, in English and Spanish, to Disco Azteca at both its Stockton, California and Cicero, Illinois addresses, asking Disco Azteca to cease and desist from:

> purchasing, importing and/or causing to be imported for distribution, sale, or other exploitation in the United States copies of records manufactured outside the United States, which contain copies of various master recordings owned exclusively by UMG Recordings, Inc. . . . .  (SUF ¶ 11.)

The letter referenced Section 602(a) of the Copyright Act and cited specific case law on the prohibition of parallel imports. (Id.)

Defendant, however, maintains that it first learned of plaintiffs' copyright claims when defendant was served with the complaint in this action on February 25, 2005.  (Certif. of Service, filed March 9, 2005.)  According to Sanchez, while it appears that UMG's letter was received and signed for by an employee of defendant, he declares it was never brought to his attention, and thus, he never responded to it.  UMG did not attempt to contact defendant further, prior to filing the instant lawsuit on December 9, 2004 (plaintiffs filed an amended

678 (S.D. Fla. 1987); 17 U.S.C. § 602(a) (prohibiting the importation, without the copyright owner's permission, of copies acquired outside the United States).

complaint on February 23, 2005).  Sanchez states that he first

saw the March 5, 2003 letter in March 2006, during the course of

this litigation.[4]  (DDF ¶ 9.)[5]

### D.  Disco Azteca's Infringing Conduct

Between March 2003 and July 2005, plaintiffs' investigators

visited Disco Azteca's retail stores and identified hundreds of

parallel-import versions of plaintiffs' copyrighted CDs

(including those listed on Schedule A to the Second Amended

Complaint) offered for sale by Disco Azteca.  (SUF ¶ 14.)  In

2003, Disco Azteca had been purchasing phonorecords[6] directly

from plaintiffs, but plaintiffs temporarily ceased selling to

Disco Azteca because it had failed to comply with plaintiffs'

---

[4]    Sanchez testified that he found the letter in a box in
his office.  While he testified he does not recall reading the
letter prior to that discovery in March 2006, he concedes that it
is his company's policy that if a letter of this type is received
by an employee that it should be forwarded to him, but in this
case, it was not.  (Sanchez Dep., 37:18-38:21, 41:2-42:8, Ex. J
to Goldman Decl., filed July 7, 2006.)

[5]    Defendant's Statement of Disputed Facts is wholly based
on the declaration of Jose Sanchez, filed July 21, 2006.
Plaintiffs filed objections to each and every paragraph of said
declaration.  (Evid. Objs. to Sanchez Decl., filed July 28,
2006.)  The court reviewed the objections and hereby overrules
them; the objections are largely based on irrelevancy
contentions, and for the reasons set forth below, Sanchez'
testimony is relevant to the willfulness determination, and to
the extent plaintiffs claim Sanchez has contradicted his
deposition testimony in this declaration, the court relies on his
deposition testimony where any conflict exists, although the
court notes that any such conflict is minor.

[6]    Phonorecords is a term used in legal definitions to
refer to physical recordings of songs, such as vinyl LPs,
cassette tapes, and compact discs.  See 17 U.S.C. § 101 (defining
"phonorecords" as "material objects in which sounds, . . ., are
fixed by any method now known or later developed, and from which
the sounds can be perceived, reproduced, or otherwise
communicated, either directly or with the aid of a machine or
device. . . .")

credit policy and had fallen behind on paying plaintiffs' invoices.[7]  (SUF ¶ 13.)  To obtain inventory during these periods when plaintiffs halted distribution, Disco Azteca began purchasing CDs from a Mexico-based company called Musical Del Norte.  (SUF ¶ 15; DDF ¶ 5.)  Sanchez testified that Musical Del Norte's salesman told him that the product he was purchasing came from "the warehouses of Universal, Fonovisa, [and] Univision" in Mexico, and that Musical Del Norte was authorized to export product from Mexico into the United States on behalf of plaintiffs--that "everything [was] legal."  (SUF ¶s 16, 17.)  The salesman assured Disco Azteca that Musical Del Norte's product was legitimate and that its distribution to Disco Azteca for sale in the United States was permitted.  (DDF ¶ 5.)

     Sanchez relied on these statements and did not attempt to verify the salesman's representations by either obtaining documentation from Musical Del Norte or contacting plaintiffs to confirm Musical Del Norte was an authorized distributor.  (SUF ¶ 19.)  Sanchez testified, at that time, he was primarily concerned about keeping Disco Azteca profitable, and that the relationship with Musical Del Norte enabled the company to "come out of a hole" financially.  (SUF ¶ 21.)  The shipments from Musical Del Norte were delivered from Tijuana, Mexico by Musical Del Norte to Disco Azteca in California.  (SUF ¶ 16.)

---

[7]     For decades previously, Disco Azteca purchased inventory directly from plaintiffs--some millions of copies of plaintiffs' recordings.  (DDF ¶ 3.)

Disco Azteca purchased around 8,000[8] CDs from Musical Del Norte in 2003 and 2004, some for equal and some for lower than the wholesale prices offered by plaintiffs.  (SUF ¶ 22.)  The packaging on plaintiffs' CDs purchased by Disco Azteca indicated that they had been manufactured by plaintiffs' Mexico-based affiliates, and the packaging was entirely in Spanish.  (SUF ¶ 28.)  Sanchez testified that when he inspected the product he received from Musical Del Norte, he only looked to see if plaintiffs' respective names appeared on the label copy of the CDs, *i.e.*, "Universal" or "Univision."  Sanchez did not check to see whether the product was identified as being manufactured in the United States or abroad.  (SUF ¶ 29.)  No one else at Disco Azteca conducted any further inspection of the product received from Musical Del Norte.  (SUF ¶ 30.)  Additionally, Disco Azteca does not have any procedures or policies which would prevent parallel imports or counterfeit product from being sold in its stores; it does not have a written policy, or any other procedure, to inform its employees that the sale of parallel imports is illegal, and it does not have any employee designated to perform such an inspection of the product it receives from suppliers.  (SUF ¶ 31.)

Disco Azteca's invoices from Musical Del Norte identified all of the works listed on Schedule A of the Second Amended Complaint as among the CDs Disco Azteca purchased from Musical

---

[8]   In his declaration submitted on the motion, Sanchez declared that "[d]efendant bought a total of 6400 units from Musical over approximately 18 months."  (Sanchez Decl., ¶ 8.) This conflicts with his deposition testimony, and as such, the court does not consider this new testimony and instead relies herein on Sanchez' deposition testimony on this issue.

Del Norte.  (SUF ¶ 24.)   Plaintiffs never licensed Disco Azteca
or Muscial Del Norte to import from Mexico into the United States
CDs containing their copyrighted works.  (SUF ¶ 23.)

     In addition to the parallel imports, plaintiffs'
investigators also discovered that Disco Azteca was selling a
"pirate" (unauthorized) compilation containing a number of
plaintiffs' copyrighted works.  (SUF ¶ 25.)   Plaintiffs did not
authorize any of their copyrighted works to appear on the pirated
compilation, and never authorized anyone to reproduce or
distribute any of the copyrighted works in the form contained on
the pirate compilation.  (SUF ¶ 26.)   Disco Azteca does not
dispute that the pirate compilation was purchased at one of its
retail stores, but it asserts that it has "no idea where the one
disc (called "Latin Hip Hop") came from" because it is not listed
in any of Disco Azteca's records and has never been ordered from
any company.  (DDF ¶ 11.)   Disco Azteca posits that while its
employees are instructed not to accept returns without a receipt,
it is possible that in this case, merchandise not originally
purchased by Disco Azteca was inadvertently received and
mistakenly stocked.  (Id.)

     When defendant was served with the complaint, it immediately
stopped purchasing from Musical Del Norte.  However, it continued
to sell the product previously purchased from Musical Del Norte.
(SUF ¶ 32; DDF ¶ 10.)   Under defendant's tracking system, it was
impossible to determine where the units purchased from Musical
Del Norte were located within defendant's stores.  Defendant's
system tracks units by title not by source; consequently,
defendant could determine the number of units of a particular

9

title that it had in stock, but it could not determine from whom they were purchased.  Therefore, the titles purchased from Musical Del Norte were sold by defendant during the pendency of this litigation, along with other titles purchased directly from plaintiffs.  (SUF ¶ 33; DDF ¶ 10.)

During the same time it purchased from Musical Del Norte, Disco Azteca purchased over 400,000 units of other titles from plaintiff.  (DDF ¶ 7.)  Accordingly, the units from Musical Del Norte accounted for about 2% of Disco Azteca's purchases for the time period.  (Id.)  In or around 2005, plaintiffs relaxed their credit policies and resumed regular distribution to Disco Azteca. Since that time, Disco Azteca has purchased several million dollars worth of inventory from plaintiffs, including approximately 500,000 units in 2005.  (DDF ¶ 8.)

**E.   Disco Azteca's Counterclaim**

In its counterclaim, Disco Azteca asserts that it is the "copyright owner by assignment of exclusive rights under copyright with respect to certain copyrighted sound recordings embodied in [its] phonorecords," entitled "Chavo Romero" and "Mis Cartas."  (Counterclaim, filed March 24, 2005, ¶ 16, Sch. A.) Disco Azteca alleges that plaintiffs have imported unlawful parallel imports of versions of these copyrighted recordings. (Id. at ¶s 16-18, 20, Sch. A.; SUF ¶s 34-35.)

However, at his deposition, Sanchez admitted that Disco Azteca has received and accepted royalty payments from counterdefendants for the alleged uses of these songs, and that the sole basis of the counterclaim is Disco Azteca's contention that counterdefendants failed to provide written credit to Disco

10

Azteca on the album packaging.  (SUF ¶ 36.)  Sanchez specifically

disavowed any claim for damages other than for the allegedly

incorrect credits:

> Q:  I guess what I'm asking you is the way that
> you've been harmed is if it turns out you haven't
> been paid royalties at the full statutory rate;
> correct?
> A:  No.  The way we've been damaged is by not
> giving credit to the right composer and to the
> right publishing company.  That's the way we've
> been damaged.
> Q:  Any other way?
> A:  Not that I can think of.

(Sanchez Dep., 195:10-19, Ex. J. to Goldman Decl.)[9]

### STANDARD

The Federal Rules of Civil Procedure provide for summary

judgment where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact."  Fed. R. Civ. P. 56(c); see California v.

Campbell, 138 F.3d 772, 780 (9th Cir. 1998).  The evidence must

be viewed in the light most favorable to the nonmoving party.

See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en

banc).

The moving party bears the initial burden of demonstrating

the absence of a genuine issue of fact.  See Celotex Corp. v.

Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to

meet this burden, "the nonmoving party has no obligation to

---

[9]     Sanchez *now* maintains, in his declaration, that
plaintiffs' payment of royalties has been "arbitrary and
irregula[r]," apparently implying that plaintiffs have not made
all payments due.  However, as set forth below, the court must
disregard said testimony as it contradicts his deposition
testimony.  Block v. City of Los Angeles, 253 F.3d 410, 419 n. 2
(9th Cir. 2001).

produce anything, even if the nonmoving party would have the
ultimate burden of persuasion at trial." <u>Nissan Fire & Marine
Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102-03 (9th Cir. 2000).
However, if the nonmoving party has the burden of proof at trial,
the moving party only needs to show "that there is an absence of
evidence to support the nonmoving party's case." <u>Celotex Corp.</u>,
477 U.S. at 325.

Once the moving party has met its burden of proof, the
nonmoving party must produce evidence on which a reasonable trier
of fact could find in its favor viewing the record as a whole in
light of the evidentiary burden the law places on that party.
<u>See</u> <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th
Cir. 1995).  The nonmoving party cannot simply rest on its
allegations without any significant probative evidence tending to
support the complaint.  <u>See</u> <u>Nissan Fire & Marine</u>, 210 F.3d at
1107.  Instead, through admissible evidence the nonmoving party
"must set forth specific facts showing that there is a genuine
issue for trial."  Fed. R. Civ. P. 56(e).

**ANALYSIS**

**A.   Defendant's Liability for Infringement**

A claim of copyright infringement under federal law,
requires proof that (1) the plaintiff had a valid copyright in
the work allegedly infringed and (2) the defendant infringed the
plaintiff's copyright by violating one of the exclusive rights
that 17 U.S.C. § 106 bestows upon the copyright holder.  <u>See</u>
<u>Marder v. Lopez</u>, 450 F.3d 445, 453 (9th Cir. 2006).  "The legal
or beneficial owner of an exclusive right under a copyright is
entitled . . . to institute an action for any infringement of

that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b).  A plaintiff need not demonstrate the defendant's intent to infringe the copyright in order to demonstrate copyright infringement.  <u>Educational Testing Service v. Simon</u>, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999) (copyright infringement "is a strict liability tort").  Specifically applicable to this case, Section 602(a) of the Copyright Act provides:

> Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies of phonorecords under section 106, actionable under section 501.

17 U.S.C. § 602(a).[10]

Here, defendant does not dispute the facts and supporting evidence proffered by plaintiff to establish defendant's liability, and thus, a finding of liability for infringement is mandated.  Specifically, defendant does not dispute that: (1) plaintiffs own the copyrights in the 38 musical works at issue on this motion;[11] (2) in 2003, defendant began purchasing CDs from a

---

[10]    Section 106(3) of the Copyright Act grants the copyright owner the exclusive right: "to distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending."  17 U.S.C. § 106(3). Section 501(a) of the Copyright Act provides that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright."  17 U.S.C. § 501(a).

[11]    Plaintiffs' copyright certificates constitute *prima facie* evidence of the validity of the copyrights and of the facts stated in the certificates, including ownership.  17 U.S.C. § 401(c); <u>Wildlife Express Corp. v. Carol Wright Sales, Inc.</u>, 18 F.3d 502, 507 (7th Cir. 1994) ("A certificate of registration from the U.S. Register of Copyrights constitutes *prima facie* evidence of the validity of a copyright.")

Mexico-based company called Musical Del Norte; (3) Musical Del Norte brought these CDs from Tijuana, Mexico to defendant in California; (4) among the CDs purchased from Musical Del Norte were the musical works at issue on the motion; (5) between March 2003 and July 2005, plaintiffs' investigators identified hundreds of parallel import versions of plaintiffs' copyrighted CDs offered for sale at defendant's retail locations; (6) defendant sold plaintiffs' copyrighted works purchased from Musical Del Norte; and (7) plaintiffs never licensed defendant or Musical Del Norte to import from Mexico into the United States CDs containing their copyrighted works.   (SUF ¶s 2, 14[12]-16, 23-24, 32[13].) Further, defendant does not dispute that the pirated compilation was purchased at one of its retail stores, and that plaintiffs did not authorize any of their copyrighted works to appear on the pirated compilation.   (SUF ¶ 26-27.)[14]

Under these undisputed facts, plaintiffs are entitled to a judgment of liability against defendant for copyright

---

[12]   That defendant "lacks sufficient information to respond to [Undisputed Fact No. 14]" does not raise a genuine issue of material fact sufficient to defeat summary judgment.   Plaintiffs have proffered evidence to support this fact (concerning its investigators' discovery of parallel imports at defendant's facilities), and defendant has offered no evidence in rebuttal; thus, the fact is properly deemed undisputed.

[13]   Defendant concedes, in its "Disputed" Fact No. 10, that plaintiffs' "titles purchased from Musical were sold along with the same titles purchased from Plaintiffs."   (DDF ¶ 10.)

[14]   Defendant asserts that it has "no record" of how the pirated compilation got into its retail store, and that its return policies are designed to prevent the receipt of such goods.   (DDF ¶ 11.)   However, copyright infringement is a strict liability tort, and because defendant has no defense for its sale of the pirated compilation, plaintiffs are entitled to summary judgment as to liability.   See Los Angeles News. Serv. v. Conus Comm. Co., Ltd., 969 F. Supp. 579, 584 (C.D. Cal. 1997).

14

infringement.

Defendant's only reference to a possible defense in this action is its statement in the factual background of its opposition that: "The units were brought by Musical into the United States and delivered; Defendant did not import them." (Opp'n at 2:23-24.)  Even assuming the truth of this statement and interpreting it as an argument in opposition to plaintiffs' infringement claims, defendant would still not prevail on the motion.  The fact that defendant did not actually import the CDs is irrelevant to the determination of liability.  <u>Columbia Broadcasting Systems, Inc. v. Scorpio Music Distributors, Inc.</u>, 569 F. Supp. 47, 48-49 (E.D. Pa. 1983) ("[T]he question whether defendant was the importer need not be resolved . . . [T]he copyright holder may proceed against any member of the chain of distribution.")  Defendant provides no contrary authority; indeed, defendant does not discuss the issue in the body of its analysis, let alone provide any legal authority in support of its factual assertion.

### B.   Willful Infringement

Section 504(c)(2) of the Copyright Act provides in pertinent part:

> In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000 [per work]."

17 U.S.C. § 504(c)(2).[15]  A plaintiff sustains its burden of

---

[15]     Otherwise, the maximum recovery per work is $30,000.
17 U.S.C. § 504(c)(1) (providing that the copyright owner may elect to recover, instead of actual damages and profits, an award

proving willfulness "by showing [the] defendant knew or should
have known it infringed [the plaintiff's] copyrights . . . .
Willful does not mean malicious, rather, it means with knowledge,
whether actual or constructive." Basic Books, Inc. v. Kinko's
Graphics Corp, 758 F. Supp. 1522, 1543 (S.D. N.Y. 1991) (internal
quotations and citation omitted); accord Peer Int'l Corp. v.
Pausa Records, Inc., 909 F.2d 1332, 1335 (9th Cir. 1990).
Alternatively, willfulness is shown where "the defendant
recklessly disregarded the possibility that its conduct
represented infringement." Yurman Design, Inc. v. PAJ, Inc., 262
F.3d 101, 112 (2nd Cir. 2001) (internal quotations and citation
omitted); Sega Enterprises Ltd. v. MAPHIA, 948 F. Supp. 923, 936
(N.D. Cal. 1996). "Willful blindness is knowledge, in copyright
law . . . as it is in the law generally . . . . [A] deliberate
effort to avoid guilty knowledge is all the law requires to
establish a guilty state of mind." In re Aimster Copyright
Litigaton, 334 F.3d 643, 650 (7th Cir. 2003).

Willfulness need not be proven directly but may be inferred
from the defendant's conduct. N.A.S. Import, Corp. v. Chenson
Enters., Inc., 968 F.2d 250, 252 (2nd Cir. 1992). "To refute
evidence of willful infringement, [a defendant] must not only
establish its good faith belief in the innocence of its conduct,
it must also show that it was reasonable in holding such a
belief." Peer Int'l, 909 F.2d at 1336.

"Generally, a determination as to willfulness requires an
assessment of a party's state of mind, a factual issue that is

of statutory damages "in a sum of not less than $750 or more than
$30,000 [for each infringement] as the court considers just").

not usually susceptible to summary judgment." Sega Enterprises, 948 F. Supp. at 936; Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 515 (9th Cir. 1985). Rather, the determination of willfulness is ordinarily a question of fact for the jury. Hearst Corp. v. Stark, 639 F. Supp. 970, 980 (N.D. Cal. 1986). However, where the relevant facts are admitted or otherwise undisputed, willfulness can be appropriately resolved on summary judgment. Peer Int'l, 909 F.2d at 1335-36; Sega Enterprises, 948 F. Supp. at 936. Although in reaching this decision, as in any summary judgment proceeding, the court must resolve questions of fact in favor of the non-moving party, here defendant, and must draw all justifiable factual inferences in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Here, plaintiffs contend that defendant has no evidence to contradict the following undisputed facts, which they argue demonstrate defendant's actual and/or constructive knowledge that its conduct constituted copyright infringement and/or, at a minimum, defendant's reckless disregard for plaintiffs' rights:

(1)   Defendant admits that the CDs it purchased from Musical Del Norte were "parallel imports;"

(2)   Defendant admits that it knows that parallel imports are illegal unless authorized;

(3)   Defendant admits that other than relying on the representations of Musical Del Norte that it was an authorized distributor, defendant did not do anything to verify whether the product it received was authorized;

(4)   Defendant admits the packaging on the CDs purchased from Musical Del Norte indicated that the CDs had been manufactured for plaintiffs' Mexico-based affiliates, and was entirely in Spanish;

17

(5)    Defendant admits that Sanchez only conducted a cursory review of the product it received from Musical Del Norte to see if plaintiffs' respective names appeared on the CDs, and did not verify whether the product was made in the United States or abroad;

(6)    Defendant admits that no further review of these CDs was conducted;

(7)    Defendant admits that it has no procedures or policies to prevent parallel imports or counterfeit goods from being sold at its retail stores;

(8)    Defendant admits it purchased and sold the parallel import versions of plaintiffs' CDs in order to keep its business profitable; and

(9)    Defendant admits that it continued to sell the infringing CDs after it received notice of this lawsuit.

(SUF ¶ 10, 15-17, 19-21, 24, 28-32.)[16]   While said facts are undisputed, they do not establish willfulness as a matter of law, as defendant has proffered evidence in rebuttal sufficient to raise a triable issue of fact as to defendant's state of mind. Specifically, defendant submits evidence which *adds* to these facts, and if those facts are believed, a jury could find in defendant's favor on the issue.

Defendant's primary evidence in rebuttal, which provides necessary context, is the following:  First, defendant believed, at all relevant times prior to the instant lawsuit being filed, that its purchase and sale of the goods from Musical Del Norte was legal.  (DDF ¶ 5.)  In that regard, defendant has submitted

---

[16]    While defendant claims to dispute some of these facts, what it really "disputes," is plaintiffs' characterization of Sanchez' deposition testimony.  <u>See e.g.</u> SUF ¶ 21 ("Plaintiffs have mischaracterized the deposition testimony of Jose Sanchez and taken his statements out of context.")  However, the deposition testimony relied on by plaintiffs is in the record, and speaks for itself, and in any event, defendant offers no contradictory evidence in response to these facts.

18

evidence to support a finding that its belief was reasonable; for example, unlike the case of a defendant selling counterfeit goods, here, defendant sold *legitimately* manufactured goods it erroneously believed were permissible to sell in the United States.  Musical Del Norte is a legitimate distributor of plaintiffs' products in Mexico, and defendant proffers evidence that it had no reason to doubt Musical's representations that it had authority to import plaintiffs' products.  (DDF ¶s 5.) Specifically, Musical Del Norte's wholesale prices were largely comparable with plaintiffs' domestic prices, and defendant believed, based on its experience,[17] that the merchandise appeared to bear appropriate notices and credits to plaintiffs. (Id.)  Indeed, defendant asserts it always believed that its purchases from Musical Del Norte would result in profits for plaintiffs.  (DDF ¶ 6.)  Defendant was told that the inventory from Musical Del Norte was picked up directly from plaintiffs' warehouses in Mexico, so its understanding was that plaintiffs or their affiliates were selling the merchandise that defendant in turn sold.  (Id.)  Based on this evidence, a jury could find that defendant reasonably believed that as long as plaintiffs or their affiliates were being paid for the merchandise it purchased from Musical Del Norte, plaintiffs would not be harmed in any way.

Defendant additionally proffers evidence that it did not receive notice of the alleged infringement until the instant action was filed, and that once the action was filed it

---

[17]   Defendant has never been involved in copyright litigation and prior to this action had no experience dealing with parallel imports.  (DDF ¶ 2.)

19

1   immediately stopped purchasing from Musical Del Norte.  (DDF ¶ 9-

2   10.)  Indeed, Sanchez testified he did not review UMG's March 5,

3   2003 letter, received by defendant but not forwarded to Sanchez,

4   until March 2006, well after this action was filed.  (DDF ¶ 9.)

5   That defendant's prior awareness of any infringement was unlikely

6   is further supported by defendant's evidence that the total

7   number of units purchased from Musical Del Norte was quite small

8   in comparison to the number of units purchased from plaintiffs

9   during the same time period (during this time, defendant

10  purchased some 400,000 units from plaintiffs and only

11  approximately 8,000 units from Musical Del Norte).  (DDF ¶ 7.)

12  Since the allegedly infringing copies represent only a small

13  fraction (some 2%) of the total inventory purchased by defendant

14  during this time period, a jury could reasonably conclude that

15  the subject infringing copies may have gone unnoticed by

16  defendant until the lawsuit was filed.

17       As to the continued sales of plaintiffs' works by defendant,

18  even after the lawsuit was filed, defendant explains the

19  limitations of its tracking system and why it was impossible for

20  defendant to stop selling the offending product.  (DDF ¶ 10.)

21  Again, if this evidence is believed, a jury could find that

22  defendant was not knowingly committing continued infringement.

23       In support of its argument for a finding of willfulness,

24  plaintiffs cite district court cases where the courts find

25  willfulness *after a trial* on the merits or appellate decisions

26  upholding findings of willfulness made after a trial on the

27  merits.  See e.g. Webloyalty.com, Inc. v. Consumer Innovations,

28  LLC, 388 F. Supp. 2d 435, 441 (D. Del. 2005) (finding willfulness

1  after a bench trial); <u>BMG Music v. Perez</u>, 952 F.2d 318, 319 (9th

2  Cir. 1991) (affirming willfulness finding made after bench

3  trial); <u>Yurman Design</u>, 262 F.3d at 113 (affirming jury's finding

4  of willfulness); <u>Dolman v. Agee</u>, 157 F.3d 708, 715 (9th Cir.

5  1998) (affirming finding of willfulness made after bench trial);

6  <u>N.A.S., Import</u>, 968 F.2d at 253 (reversing trial court's finding

7  of no willfulness found after a bench trial); <u>see also</u> <u>Granada</u>

8  <u>Sales Corp. v. Aumer</u>, 2003 WL 21383821, *2 (S.D. N.Y. 2003)

9  (finding willfulness after default judgment entered).  These

10  cases are inapposite here as they do not address the willfulness

11  issue as presented on a motion for summary judgment; at this

12  stage, in determining whether a triable issue of fact remains,

13  the court must construe the facts in favor of defendant and draw

14  all reasonable inferences in its favor.

15      As to those few cases cited by plaintiffs wherein courts

16  found willfulness as a matter of law, the cases are readily

17  distinguishable.  For example in <u>Sega Enterprises</u>, the court

18  found that defendant "offered *nothing* to rebut" the evidence that

19  he "intentionally contributed to the users' infringement of

20  Sega's copyright, and that he intended to profit in sales of

21  copiers" by giving customers a free download of Sega's

22  copyrighted games when they purchased a copier.  948 F. Supp. at

23  936.  Here, as set forth above, defendant has proffered

24  significant evidence of its reasonable good faith belief to rebut

25  plaintiffs' showing of willfulness.

26      In <u>Peer Int'l</u>, also relied on by plaintiffs, the

27  determinative factor in finding willfulness, as a matter of law,

28  was the defendant's *undisputed* notice of the alleged infringement

21

and his continued infringement thereafter despite the notification.  909 F.3d at 1235-36 (finding willfulness because the defendants received notice of the termination of their licenses to manufacture, distribute and sell certain copyrighted nondramatic musical compositions, continued to fail to account for and pay royalties, yet nevertheless continued to manufacture and distribute the copyrighted work); accord Microsoft Corp. v. Logical Choice Computers, Inc., 2001 WL 58950 (N.D. Ill. 2001) (finding the defendants' behavior knowing or "willfully blind," as a matter of law, because "despite receiving Microsoft's June 20, 1997 cease-and-desist letter which confirmed that certain software [the] defendants had acquired from unauthorized suppliers was counterfeit, defendants continued to obtain software from unauthorized suppliers").  Unlike Peer Int'l and Logical Choice, the issue of defendant's notice of the alleged infringement and conduct thereafter is heavily *disputed*.  As such, plaintiffs' authorities are not persuasive.

Instead, the court finds that defendant's authorities are factually closer and support the denial of plaintiffs' motion. For example, in Island Software and Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257 (2nd Cir. 2005), Microsoft argued that the deposition testimony of Island's principal established sufficient "reckless disregard" and "willful blindness" to compel a finding of willfulness.  Id. Microsoft's argument was based on three key facts:  First, Island conceded that it had purchased products from a company that it did not consider a "regular distributor" because its prices were inconsistent.  Microsoft argued that this established that Island was suspicious of the

authenticity of the purchased products.  Id.  Second, Island

conceded that it did not investigate a claim of counterfeit

products, allowing the matter to drop when its customer did not

attempt to return the products in question.  Microsoft argued

that this causal response constituted clear willful blindness

because a reasonable merchant would have taken additional steps

to investigate the authenticity of his products.  Id.  Finally,

Island conceded that it did not take extensive measures to

prevent the receipt and sale of high-quality counterfeit

merchandise.  Rather, Island's employees would conduct a

relatively quick visual inspection of goods, and on some

occasions, would not even examine products upon receiving them

from distributors.  Microsoft asserted that taken together said

facts conclusively proved willfulness.  Id.

        The court disagreed holding:

> [A]t this stage of the proceedings, where we
> must draw all inferences in favor of the non-
> moving party, we cannot say that, as a matter
> of law, Island is entitled to summary judgment
> on the question of willfulness.  A jury could,
> without doubt, conclude that Island's statements
> reveal willful blindness, or establish a pattern
> of conduct so unreasonable as to constitute
> reckless disregard.  *Still, it is not beyond
> peradventure that a reasonable jury would
> conclude otherwise.  And that is enough to make
> summary judgment on the issue of willfulness
> inappropriate.*

Id. at 263-64 (emphasis added); accord Chanel, Inc. v. Italian

Activewear of Florida, Inc., 931 F.2d 1472 (11th Cir. 1991)

(trademark case) (acknowledging that a "strong inference" of

knowledge or willful blindness could be drawn from the facts that

the defendant's principal knew the counterfeit goods lacked the

indicia of authenticity and knew that the broker who provided the

counterfeit goods was not an authorized distributor yet did not ask about the origin of the goods, but finding summary judgment not warranted as willfulness could not be found as a matter of law.)

Similarly here, based on the evidence offered by defendant, the court cannot find that no reasonable trier of fact would rule in defendant's favor.  While it is, like in Island Software, "without doubt" that a jury could find that the evidence relied on by plaintiffs demonstrates, at least, defendant's willful blindness or reckless disregard, of the possibility that its conduct constituted infringement, it is "not beyond peradventure that a reasonable jury could conclude otherwise."  413 F.3d at 264 ("at the summary judgment stage, although an inference of constructive knowledge or reckless conduct seems the better of the possible inferences that can be drawn, we must still draw all inferences in favor of the non-moving party").  And thus, the court cannot grant summary judgment in favor of plaintiffs on the issue of willfulness.

### C.   Defendant's Counterclaim

Plaintiffs move for summary judgment in favor of counterdefendants on defendant's counterclaim for infringement on the grounds that defendant has no evidentiary support for such a claim and/or their stated claim is not cognizable under the Copyright Act.  First, with respect to defendant's allegation of infringement by counterdefendants, Sanchez conceded at deposition that Disco Azteca has received and accepted royalty payments from counterdefendants, and thus, defendant has not been damaged by counterdefendants' alleged uses of defendant's copyrighted songs.

(SUF ¶ 36; Sanchez Dep., 195:10-19, Ex. J. to Goldman Decl.)
Such acceptance of counterdefendants' payments gives rise to an
implied license as a matter of law.  See Effects Assocs., Inc. v.
Cohen, 908 F.2d 555, 558 (9th Cir. 1990); Pamfiloff v. Giant
Records, Inc., 794 F. Supp. 933, 938-39 (N.D. Cal. 1992).
Moreover, because the implied license here is supported by
consideration, it is irrevocable.  See Effects, 908 F.2d at 559;
Lurlirama Ltd., Inc. v. Axcess Broadcast Servs., Inc., 128 F.3d
872, 882 (5th Cir. 1997).

Apparently realizing the effect of his admissions, Sanchez
now claims, in his declaration filed in support of defendant's
opposition, that "[s]uch [royalty] payments [by
counterdefendants] were arbitrarily and irregularly made," and
thus, defendants *were* "damaged under Sections 106, 501, and
602(a) of the Copyright Act."  (Opp'n at 11:2-3.)  However, the
court must disregard Sanchez' declaration on this issue as it
directly contradicts his deposition testimony.  Block v. City of
Los Angeles, 253 F.3d 410, 419 n. 2 (9th Cir. 2001) ("A party
cannot create a genuine issue of material fact to survive summary
judgment by contradicting his earlier version of the facts.").

Accordingly, defendant's only remaining argument, supported
by Sanchez' deposition testimony, is that Disco Azteca was
damaged by counterdefendants' failure to provide written credit
to Disco Azteca (and the writer of the original song) on the
album packaging.  (Sanchez Dep., 195:10-19, Ex. J. to Goldman
Decl. ["The way we've been damaged is by not giving credit to the
right composer and the right publishing company.  That's the way
we've been damaged.].)  However, it is well established that the

25

right to attribution is not a protected right under the Copyright Act.  Wolfe v. United Artists Corp., 583 F. Supp. 52, 56 (E.D. Pa. 1983) (holding that the "failure to give [a] plaintiff proper authorship credit in a copyrighted work is not a [cognizable] Copyright Act claim") (internal quotations and citations omitted); accord Tangorre v. Mako's, Inc. 2003 WL 470577, *8 (S.D. N.Y. 2003) (rejecting argument that plaintiff's "copyrights were infringed when [the defendant] failed to provide him with written copyright credit on the [allegedly infringing work]" because "a failure to give copyright credit is not an act of copyright infringement").  Copyright law is a creature of statute, 17 U.S.C. § 101 et seq., and a party's rights and remedies under the Copyright Act must be derived from the infringement of one of the exclusive rights set forth in the Act. Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 154-55 (1975).  Those exclusive rights are enumerated in Section 106 --reproduction, adaptation, distribution, performance and display.  17 U.S.C. § 106.  The right to be credited is not one of these rights.  Thus, the failure to credit a copyright owner is not an infringement, and defendant accordingly does not have a viable claim against counterdefendants for infringement.[18] Summary judgment in favor of counterdefendants is therefore granted.

---

[18]    Indeed, defendant's only other argument in support of its counterclaim is, paradoxically, its admission that it has no evidence to support its copyright claim.  Defendant asserts that it has no record of the number of infringements that have occurred.  (Opp'n at 11 ["Defendant does not know the extent of Plaintiffs' infringement . . ."].)  This admission, alone, supports the grant of plaintiffs' motion.

1

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment or, alternatively, partial summary judgment is GRANTED IN PART and DENIED IN PART.  The court grants plaintiffs' motion as to liability and finds that defendant directly infringed plaintiffs' 38 copyrighted works at issue on the motion. However, the court cannot find, as a matter of law, that said infringement was "willful," and thus, the court denies plaintiffs' motion on that issue.  As to defendant's counterclaim for infringement, the court finds counterdefendants entitled to a finding of non-liability for infringement and thus, plaintiffs' motion in this regard is granted.

IT IS SO ORDERED.

DATED: August 14, 2006

/s/ Frank C. Damrell Jr.
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE

27